IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:08-CT-3070-D

MICHAEL W. HILL,                           )
                                           )
                    Plaintiff,             )
                                           )
          v.                               )          **ORDER**
                                           )
UNITED STATES OF AMERICA, et al.,          )
                                           )
                    Defendants.            )

On June 10, 2008, Michael W. Hill ("Hill" or "plaintiff"), a former federal inmate incarcerated at the Federal Correctional Institution-Medium II in Butner, North Carolina ("FCC-Butner" or "Butner"), filed this action under Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971) ("Bivens") [D.E. 1].[1] On October 16, 2008, in response to the court's order to particularize [D.E. 2], Hill filed an amended complaint stating that he sought relief under Bivens (count one) and the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671–2680 (count two) [D.E. 3]. Hill sues the United States of America ("United States"), Robert Walasin ("Walasin"), Christine Fallon ("Fallon"), and Mark Wilson ("Wilson") (collectively "defendants"). Hill complains that defendants acted with deliberate indifference to his serious medical needs (count one) and failed to provide adequate medical care (count two) concerning treatment for herpes during his incarceration at Butner.

On September 30, 2009, defendants filed a motion to dismiss or, in the alternative, for summary judgment [D.E. 19]. Because defendants attached materials that are outside the scope of

---

[1]On January 11, 2010, the Federal Bureau of Prisons ("BOP") released Hill. See BOP Inmate Locator, http://www.bop.gov/iloc2/LocateInmate.jsp (last visited Aug. 4, 2010).

the pleadings, the court construes the motion as requesting summary judgment. See Fed. R. Civ. P. 12(d). The court notified Hill about the motion for summary judgment, the consequences of failing to respond, and the response deadline [D.E. 21]. See Roseboro v. Garrison, 528 F.2d 309, 310 (4th Cir. 1975) (per curiam). On November 9, 2009, Hill filed a declaration in opposition [D.E. 24] and a statement of disputed factual issues [D.E. 26]. Hill also filed a Rule 56(f) affidavit [D.E. 25]. See Fed. R. Civ. P. 56(f). On November 23, 2009, Hill filed his memorandum in opposition [D.E. 28].

For the reasons explained below, the court denies Hill's Rule 56(f) request to continue the motion for summary judgment [D.E. 25], and grants defendants' motion for summary judgment on plaintiff's Bivens and FTCA claims [D.E. 19].

I.

Before addressing defendants' motion for summary judgment, the court considers Hill's Rule 56(f) request [D.E. 25]. See Fed. R. Civ. P. 56(f). Hill contends that summary judgment is premature and asks the court to deny or continue defendants' motion for summary judgment. See Pl.'s Rule 56(f) Aff.

Rule 56(f) of the Federal Rules of Civil Procedure provides:

If a party opposing the motion shows by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:

(1) deny the motion;

(2) order a continuance to enable affidavits to be obtained, depositions to be taken, or other discovery to be undertaken; or

(3) issue any other just order.

Fed. R. Civ. P. 56(f). Under Rule 56(f), a court may delay ruling on a motion for summary judgment if the respondent requires discovery to identify "facts essential to justify the party's opposition." Crawford-El v. Britton, 523 U.S. 574, 599 n.20 (1998) (quotation omitted); Nader v. Blair, 549 F.3d

2

953, 961 (4th Cir. 2008); White v. BFI Waste Servs., LLC, 375 F.3d 288, 295 n.2 (4th Cir. 2004).

Hill states that defendants' motion "makes a number of factual allegations with which plaintiff disagrees," and "plaintiff has not had the opportunity to conduct any discovery to support his claims." Pl.'s Rule 56(f) Aff. ¶¶ 3–4. Specifically, Hill claims that he requires discovery concerning:

> (a) The name of the defendant who ordered the herpes laboratory (i.e., blood test) testing around July 2007; (b) The BOP policy on pain assessment and treatment; (c) The BOP/FCI-Butner policy on how and when inmates are informed of newly found health problems; and (d) Whether plaintiff received testings, i.e., MRI, C[AT] s[c]ans, and [u]ltra-[s]ound to determine the extent of nerve damages/tissue damage caused by herpes.

Id. ¶ 6.

Under Rule 56(f), a court may defer ruling on a motion for summary judgment if the non-movant demonstrates that he has not had sufficient time to present facts in opposition to the summary judgment motion. See, e.g., Harrods Ltd. v. Sixty Internet Domain Names, 302 F.3d 214, 244 (4th Cir. 2002). In analyzing a request under Rule 56(f), a court may consider whether the party has failed to pursue discovery diligently. See White, 375 F.3d at 295 n.2; Harrods Ltd., 302 F.3d at 245; Strag v. Bd. of Trustees, 55 F.3d 943, 954 (4th Cir. 1995).

Because Hill's status was a prisoner when his alleged claims arose, defendants do have control over certain relevant documents. As for Hill's diligence in pursuing discovery, Hill claims that discovery is precluded while "[t]he pleadings remain open." See Pl.'s Rule 56(f) Aff. ¶ 2. Hill is mistaken. The timing and planning conference requirements for discovery do not apply to this action. See Fed. R. Civ. P. 26(a)(1)(B)(iv), (d)(1), (f)(1). Since defendants' appearance on September 30, 2009, Hill has had ample time to engage in discovery. Any discovery requested in Hill's Rule 56(f) affidavit was not submitted in compliance with Rules 33 and 34 of the Federal

3

Rules of Civil Procedure or Local Civil Rule 7.1(c). See Fed. R. Civ. P. 33, 34; Local Civil Rule 7.1(c), EDNC. Hill has failed to pursue discovery diligently.

In considering Hill's Rule 56(f) motion, the court notes that defendants assert the defense of qualified immunity. See Mem. Supp. Mot. Summ. J. ("Mem. Supp.") 13. The court has discretion to manage a case to ensure "that officials are not subjected to unnecessary and burdensome discovery or trial proceedings." Crawford-El, 523 U.S. at 597–98; see Lescs v. Martinsburg Police Dep't, 138 Fed. Appx. 562, 564 (4th Cir. 2005) (per curiam) (unpublished). "Where the defendant seeks qualified immunity, a ruling on that issue should be made early in the proceedings so that the costs and expenses of trial are avoided where the defense is dispositive." Saucier v. Katz, 533 U.S. 194, 200 (2001), overruled on other grounds by Pearson v. Callahan, 129 S. Ct. 808 (2009). Moreover, the defense of qualified immunity is "'an entitlement not to stand trial or face the other burdens of litigation.'" Saucier, 533 U.S. at 200 (quoting Mitchell v. Forsyth, 472 U.S. 511, 526 (1985)). Indeed, "[t]he entitlement is an immunity from suit rather than a mere defense to liability." Mitchell, 472 U.S. at 526. Because the moving defendants raise the defense of qualified immunity, they are entitled to protection from discovery if the defense applies. Thus, the court denies plaintiff's Rule 56(f) request to continue or deny defendants' motion for summary judgment pending discovery [D.E. 25]. See Fed. R. Civ. P. 56(f)(1); White, 375 F.3d at 295 n.2; Strag, 55 F.3d at 954.

## II.

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2); see, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). The party seeking summary judgment initially must demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S.

4

317, 325 (1986). Once the moving party has met its burden, the nonmoving party may not rest on the allegations or denials in its pleading, Anderson, 477 U.S. at 248, but "must come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis removed) (quotation omitted).

In determining whether a genuine issue of material fact exists for trial, a trial court views the evidence and the inferences drawn therefrom in the light most favorable to the nonmoving party. Scott v. Harris, 550 U.S. 372, 378 (2007). However, "[t]he mere existence of a scintilla of evidence" in support of the nonmoving party's position is not sufficient to defeat a motion for summary judgment; "there must be evidence on which the [fact finder] could reasonably find for the [nonmoving party]." Anderson, 477 U.S. at 252.

On June 11, 2007, the BOP transferred Hill from Federal Correctional Institution-Gilmer, West Virginia to Butner allegedly to receive treatment for multiple medical conditions including mixed connective tissue disorder. Am. Compl. ¶¶ 8, 10; see Pl.'s Decl. Opp'n Mot. Summ. J. ("Decl. Opp'n") ¶ 4. Before his transfer to Butner, Hill states that he experienced "un-diagnosed symptoms of herpes," which caused pain. Decl. Opp'n ¶ 4. Hill claims that during his intake screening, he reported "pain in and around the [c]occyx-sciatica-buttock area," to a paramedic who allegedly told him to address the issue with a physician at a chronic care visit. Mem. Opp'n Mot. Summ. J. ("Mem. Opp'n") 2.

In early July 2007, Hill claims that he complained to Fallon about pain in his coccyx area and down the back of his legs. Decl. Opp'n ¶ 10. Fallon is a nurse practitioner at Butner. Mem. Supp., Ex. A, Fallon Decl. ("Fallon Decl.") ¶¶ 1–2. Hill alleges that Fallon indicated that she would refer him to a urologist, with whom he should discuss his complaints. Decl. Opp'n ¶ 10.

On July 20, 2007, Hill saw a urologist. Mem. Opp'n 2; see Decl. Opp'n 11. According to

5

Hill, he presented with sores and blisters in the coccyx area. Decl. Opp'n 11. The urologist ordered prostate antigen and herpes testing. Id.; Mem. Opp'n 2. On July 26, 2007, Hill underwent testing for herpes. Am. Compl. ¶ 12. On August 9, 2007, the clinical laboratory results revealed that Hill tested positive for herpes I and II. Decl. Opp'n, Ex. 2.

In late August 2007, Hill requested and received copies of his medical records which included the herpes test results. Decl. Opp'n ¶¶ 13–14. Hill claims that defendants did not discuss the test results with him or provide a treatment plan for months. Id. ¶¶ 14, 17–18. Hill alleges that Butner's Assistant Health Services Administrator Reed ("Reed") told him that inmates who test positive to a new condition should receive immediate notice. Id. ¶ 16.

On September 27, 2007, at about 11:15 p.m., Hill claims that he "began suffering unbearable pain and discomfort" in his lower back, legs, and buttocks. Id. ¶ 20. Hill notified correctional officer Ruiz about his pain and inability to sit, stand, or lay down without increased pain and discomfort. Id.; Am. Compl. ¶ 15. After calling his supervisor, Ruiz instructed Hill to report to the medical department in the morning. Am. Compl. ¶ 16.

On September 28, 2007, Hill presented for sick call under the direction of Wilson, a Butner paramedic/emergency medical technician. Id. ¶¶ 4, 16. Hill claims that he rated his pain as a 10 on a scale of 10 on the written request form. Id. ¶ 16. Hill also asserts that he reported that he was unable to sit, stand, or lie down without increased leg and back pain. Id. Hill complains that Wilson failed to examine him, inquire about his pain, or review his medical chart to "take notice of [his] chronic ailments." Decl. Opp'n, Ex. 10 at 3. According to Hill, Wilson indicated that he could do nothing for the pain, even though Hill recalls seeing "a large number of medical staff" in the medical department that morning, including Walasin, a Butner physician. See Dec. Opp'n ¶¶ 23–24; see also Am. Compl. ¶¶ 2, 16–17. Wilson allegedly stated that if Fallon came in that day, he would ask

6

Fallon to see Hill. Dec. Opp'n ¶ 23; see Am. Compl. ¶ 16. Otherwise, Hill asserts, Wilson indicated that Hill would have to wait until his name came up on sick-call to be seen. Dec. Opp'n ¶ 23. When Walasin passed him in the hallway, Hill alleges that the doctor rejected his request for assistance indicating that he "already spend[s] [too] much time answering [Hill's] cop-outs." Id. ¶ 25; see Am. Compl. ¶ 17. Hill complains that he was refused a "same day exam" with a doctor or physician assistant "after discussing his health issue[]s " with Wilson. Mem. Opp'n 10–11. Later that day, Hill claims that he reported his medical concerns, including herpes, to Reed, who allegedly confirmed Wilson's statement that Hill must wait for his name to come up on "call-out" to be seen. Am. Compl. ¶ 18; Decl. Opp'n ¶ 27.

On September 29, 2007, Hill submitted an Inmate Request to Staff regarding his frustration with the sick-call staff's response the previous day to his report of "unbearable pain." See Decl. Opp'n, Ex. 1. On October 5, 2007, the associate warden responded indicating that the Health Services Department staff member determined that Hill's "back/hip ache did not require a same day appointment," and informed Hill that he would be seen at a later date. Id.

On October 1, 2007, Hill asserts that he complained to Warden Chapman ("warden") about the staff's alleged failure to respond to his pain. Am. Compl. ¶ 21. Hill also claims that he showed the warden literature on herpes. Decl. Opp'n ¶ 28. The warden allegedly advised Hill to submit an Inmate Request to Staff. Am. Compl. ¶ 21; see Decl. Opp'n ¶ 28.

On October 5, 2007, Fallon examined Hill. Am. Compl. ¶ 22. Hill claims that he talked to Fallon about his pain and showed her the sores and blisters on his lower back. Id. According to Hill, Fallon indicated that he did not have herpes. Decl. Opp'n ¶ 29. Hill finds it "incredible" that Fallon was unaware of his herpes diagnosis because the test results were returned on August 20, 2007 and contained in his folder. Mem. Opp'n 3–4; see Decl. Opp'n ¶ 29. Hill states that Fallon then

7

conferred with Physician Assistant Burt, and concurred, after also reviewing the lab report, that Hill was experiencing a herpes outbreak. Decl. Opp'n ¶ 29; see Am. Compl. ¶ 22. Hill alleges that Fallon indicated that Tylenol would be provided to him at the evening pill-line. Decl. Opp'n ¶ 30; see Am. Compl. ¶ 22. Hill further claims that he referred Fallon to the September 26, 2007 rheumatologist's note indicating that Hill should receive "any Opioid available (Non-Tylenol) for pain management." Decl. Opp'n ¶ 32; see Decl. Opp'n, Ex. 6. According to Hill, he did not receive any medication that evening, although Fallon recorded "Tylenol" in her notes. Am. Compl. ¶ 23; Decl. Opp'n ¶ 32; see Decl. Opp'n, Exs. 4, 6. In addition to pain medication, Hill alleges that Fallon should have prescribed an antiviral treatment, such as Valtrex, at that visit. See Mem. Opp'n 11.

On November 6, 2007, Walasin examined Hill. Am. Compl. ¶ 25. Hill claims that he listed his medical concerns, including significant pain in his lower back, legs, groin, and buttocks and sleep difficulties. Id. ¶¶ 25, 27. Upon examination, Walasin allegedly confirmed that Hill had a herpes or shingles outbreak and acknowledged its effects, including pain, burning, and nerve damage. Id. ¶ 26; Decl. Opp'n ¶¶ 34, 36; see Decl. Opp'n, Ex. 7. Hill claims that Walasin called the pain "Neuralgia or Postherpetic Neuralgia." Decl. Opp'n ¶ 36. Walasin reviewed the lab report in Hill's medical file. Id. ¶ 33. Hill claims that he told Walasin that he experienced constant pain, which impacted his other chronic, also painful, medical conditions. Id. ¶ 37. Additionally, Hill asserts that he advised Walasin that he could not sit, stand, or lie down without the pain increasing. Id. Hill claims that Walasin agreed to look into treatment options. Am. Compl. ¶ 28; Decl. Opp'n ¶ 35, Ex. 7. In the interim, Walasin allegedly denied Hill's request for pain medication and failed to order testing to assess possible nerve damage. Am. Compl. ¶¶ 29, 31; Decl. Opp'n ¶¶ 38, 40. Walasin's record reads, "I do not see that [Hill] is in that much discomfort around the compound that he needs narcotic." Decl. Opp'n ¶ 39; see Decl. Opp'n, Ex. 7.

8

On November 7, 2007, Hill submitted an Inmate Request to Staff objecting to Walasin's general treatment and refusal to provide pain medication on the previous day. Decl. Opp'n, Ex. 8. In response to Hill's complaints, Warden Morgan talked with the Health Services Department and was informed that Hill's medical record showed the following:

> 1. You are currently on two powerful anti-inflammatory medications, which should provide you some relief from the pain associated with your shingles.
>
> 2. Dr. Walasin's note in your chart stated that he "Will research drug profiles to see if anti-viral therapy is compatible with (Methotrexate) and his autoimmune disorder."
>
> 3. It is noted that Dr. Walasin sent an e-mail to the Chief Pharmacist on November 7, 2007, requesting his assistance in ascertaining whether or not there would be contraindications to putting you on anti-viral medication. The Chief Pharmacist did answer back, stating that he could find no contraindication to having you begin on Acyclovir (an anti-viral medication) the next time that you experience an outbreak of shingles.
>
> 4. Dr. Walasin indicated in his notes that he still felt that additional pain medication, specifically narcotic pain medications, are not indicated in your case.

Id.

According to Hill, upon diagnosis of herpes, a patient should receive one tablet of an antiviral medication daily. Decl. Opp'n ¶ 42. Hill alleges that this conventional treatment does not eradicate the virus, but minimizes outbreaks and eases the painful symptoms. Id. Hill objects to defendants' alleged efforts to portray his outbreaks and pain as "minor inconveniences that caused him no serious discomfort." Mem. Opp'n 5.

Hill agrees that his first herpes complaint occurred on September 27, 2007, and he received antiviral medication by late November 2007. See Decl. Opp'n ¶¶ 43, 44. Hill disagrees that the delay in providing medication was excusable to enable defendants to obtain information about possible drug interactions. Decl. Opp'n ¶ 45; see Decl. Opp'n Ex. 8. According to Hill, his records showed that he had taken narcotic pain medication without problem before his arrival at Butner.

9

Decl. Opp'n ¶ 46. Thus, Hill asserts that Walasin was not justified in leaving him in pain for months. Id.

Hill maintains that defendants failed to provide prompt medical attention, including examination and the prescription of antiviral treatment and pain medication. Mem. Opp'n 11–12. Hill denies being "examined or treated comprehensively" for his herpes pain until February 15, 2008. Id.

Upon reassignment to Dr. Claudius, Hill claims that he began a comprehensive treatment plan including antiviral and narcotic pain medications, daily examinations, and washing of an impacted area upon outbreak. Decl. Opp'n ¶ 49. Hill alleges that Dr. Claudius prescribed the antiviral treatment and pain medication at his first consult. See Mem. Opp'n 11.

Hill asserts that as a result of the alleged deliberate indifference and negligence of defendants, he experienced unnecessary and uncontrolled pain, neuralgia, causalgia, sciatica, nerve damage, and the inability to sleep, sit, stand, or lie down normally, as well as other unknown injuries. Am. Compl. ¶¶ 40, 49. Hill seeks $1,000,000.00 in compensatory and punitive damages against the individual defendants in count one and $1,000,000.00 in compensatory damages against the United States in count two. Am. Compl. 9, 10.

In considering defendants' motion for summary judgment, the court has reviewed the materials in the record, including the declaration of defendant Fallon.[2] According to Fallon, she reviewed Hill's official files and the BOP's records, and her declaration is made on the basis of that review, her personal knowledge, or information she acquired through the performance of her official

_____

[2]Hill challenges Fallon's declaration as "self-serving" and based upon "internally-generated records." See Mem. Opp'n 5. A court may consider declarations on summary judgment that present evidence that would be admissible if the declarant were testifying in court. See, e.g., Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 962 (4th Cir. 1996). Fallon's declaration presents evidence that would be admissible if she testified at trial.

duties. Fallon Decl. ¶ 4.[3] Defendants did not include a copy of Hill's medical record with their supporting memorandum; however, plaintiff provided excerpts of his medical record in opposition to the motion for summary judgment. See, e.g., Decl. Opp'n, Exs. 2, 4, 6, 7.

In general, an inmate may seek emergent or non-emergent medical treatment. Fallon Decl. ¶ 5. On days routine sick call is conducted, an inmate may request a single sick-call appointment. Id. ¶ 6. After triage, nursing staff refer the inmate to the mid-level provider. Id. In addition, a chronic care clinic offers treatment and follow-up for chronic diseases. Id. Health Services staff refer inmates to a chronic care clinic for chronic or recently diagnosed health problems. Id.

On June 11, 2007, Hill arrived at Butner and underwent an intake medical screening. Id. ¶ 8. Hill identified three current medications, which he received to treat hypertension, angina, and an enlarged prostate. Id. The intake-screening physician changed Hill's hypertension medication. Id. Hill's medical record and transfer sheet did not include any diagnosis of herpes or shingles. Id.

On June 20, 2007, Hill was seen in the rheumatology clinic. Id. ¶ 9.

On July 10, 2007, Fallon saw Hill for the first time at a sick-call appointment. See id. ¶ 10. Hill requested an increase in his prostate medication. Id. Hill complained of urology symptoms and constipation. Id. Hill did not indicate that he was experiencing pain. Id. Fallon noted the examination of Hill's abdomen as unremarkable. Id. Fallon reviewed a prior urology consult, increased the dosing of the prostate prescription, and ordered medication to treat his constipation. Id.

On July 20, 2007, a urologist saw Hill and recommended more laboratory testing, a Prostate Stimulating Antigen test, and a medication change. Id. ¶ 11. The urologist requested a follow-up

---

[3]Fallon is a commissioned officer in the United States Public Health Service. Fallon Decl. ¶ 1. Since October 2006, Fallon has worked as a nurse practictioner at Butner. Id. ¶¶ 1–2.

in one month. Id. All recommendations were followed. Id.

On August 13, 2007, Walasin saw Hill in the chronic care clinic for a complaint of blood in his stool. Id. ¶ 12. The record contains no indication that Hill complained of herpes or pain. Id. According to Walasin's notes, Walasin discussed Hill's medical problems with him. Id. Walasin also noted that Hill would be referred to a rheumatologist for interpretation of lab reports and treatment recommendations. Id.

On August 27, 2007, a nurse saw Hill in sick call. Id. ¶ 13. Hill reported a two-day history of vomiting, stomach pain, headache, weakness, and dizziness. Id. Hill denied taking any medication. Id. The nurse instructed Hill to rest, drink clear liquids, and to return if his condition worsened. Id. Hill received Tylenol to treat a low-grade fever. Id. Later that day, a physician assistant saw Hill. Id. ¶ 14. Hill indicated that he had experienced abdominal cramps, nausea, and vomiting for three days. Id. Additionally, Hill complained of watery stools for three to four days, fever, and chills. Id. Hill stated that he felt sick after eating something a couple days earlier. Id. The physician assistant diagnosed gastroenteritis and prescribed Phenergan, an antihistamine which also treats nausea and vomiting. Id. Hill received instructions to eat bland foods for the next 48 hours, increase his fluid intake, and obtain Immodium for his "loose stools" and Tylenol for his fever from the commissary. Id.

On September 7, 2007, Hill was seen in follow-up at the urology clinic. Id. ¶ 15.

On September 19, 2007, Fallon saw Hill at sick call. Id. ¶ 16. Hill requested a medication change from Zantac to Prilosec, because of the "nausea, vomiting and diarrhea" he experienced a few weeks earlier. Id. Fallon did not change the medication based on a three-day history of these complaints, which were attributed to acute gastroenteritis. Id. Instead, Fallon ordered a laboratory test to rule out any treatable infection and to deter any further gastric problems. Id. Hill also

12

reported blood when he wiped, which was related to his history of hemorrhoids. Id. Hill denied fever, chills, nausea, vomiting or diarrhea in days. Id. Hill agreed that he may have indigestion, heartburn, and a gastrointestinal virus. Id. Upon examination, Fallon noted no gastric tenderness. Id. Fallon ordered follow-up laboratory tests. Id.

On September 26, 2007, Hill returned to the rheumatology clinic. Id. ¶ 17. Walasin determined that Hill would be seen in the chronic care clinic. Id. Walasin prescribed Methotrexate for rheumatoid arthritis and increased Hill's prescription for Prednisone, a steroid that treats arthritis. Id. Walasin noted that he disagreed with the rheumatologist's recommendation for narcotics. Id.

Fallon makes no reference to Hill's assertion that he presented at sick call on September 28, 2007, and received no assistance for his pain from Wilson (or Walasin).

On October 5, 2007, Fallon saw Hill in sick call. Id. ¶ 18. Hill reported a history of back pain for weeks with a pain level at 7 out of 10. Id. Hill also indicated that he had pain and blisters in his coccyx area. Id. Hill told Fallon that he removed the blisters himself. Id. Fallon observed a reddened vesicular rash on Hill's coccyx and diagnosed a herpes infection. Id. Fallon instructed Hill not to open the blisters, to wash his hands thoroughly, and to take Tylenol for discomfort. Id. Fallon recalls that the rash was "crusted over." Id. Based on the appearance of the rash and Hill's report of this specific pain for "weeks," Fallon concluded that it was "beyond the point of any effective treatment with antiviral therapy" or "prescriptive herpes treatment." Id. ¶¶ 18–19. Fallon concluded that Acyclovir, an antiviral medication used to suppress genital herpes, "would not offer any more relief." Id. ¶ 19. Fallon focused on prevention and control of the disease process with Hill in light of his practice of removing the crusted areas himself. Id. Contrary to Hill's assertions, Fallon denies telling plaintiff that he would receive medication at the evening pill-line. Id. Hill's October 5, 2007 sick-call visit with Fallon marked "the first instance in [Hill's] medical records,

13

since his arrival at FCI Butner II in June of 2007, that he complained of pain due to herpes." Id.

On November 6, 2007, Walasin saw Hill in the chronic care clinic. Id. ¶ 20. Hill complained of pain in the right shoulder, left foot, and back radiating down to his lower extremities. Id. In addition, Hill complained of right leg pain, which he stated was worse during a shingles outbreak. Id. Hill indicated that he experienced several shingles outbreaks per year. Id. According to the record, Walasin observed Hill walk across the compound from the "M" housing unit without difficulty, a limp, or alteration in his gait. Id. Hill's current medications and their prescribed treatment purpose included Diltiazem (hypertension and angina), Folic Acid, Losartan potassium (hypertension), Methotrexate Sodium (rheumatoid arthritis), Oxybutynin (overactive bladder), Prednisone (arthritis), Ranitidine (stomach and intestinal ulcers), and Tamsulosin (enlarged prostate). See id. ¶ 22. Walasin noted that he "would research drug profiles to see if anti-viral therapy was compatible with [Hill's] current prescription for Methotrexate and [Hill's] autoimmune disorder." Id. ¶ 21. Walasin declined to prescribe narcotics, advising Hill that he had witnessed him walking around the compound without discomfort. Id.

On November 15, 2007, Hill reported to a Butner paramedic that he could feel his heart beating and had experienced heart palpitations that lasted ten to fifteen minutes after riding an exercise bike. Id. ¶ 23. Hill's vital signs were taken. Id. Hill reported feeling better and received instructions to return if his condition worsened. Id.

On November 16, 2007, Fallon saw Hill for a complaint of an irregular heart beat. Id. ¶ 24. Fallon found Hill's heart rate to be normal, at 60 beats per minute, and without irregularity. Id. Hill also complained of blisters and a herpes outbreak on his coccyx area. Id. Fallon noted that the area was clean and appeared to be healing. Id. Fallon observed minimal redness and no blisters. Id. Hill indicated that he had consumed a lot of Tylenol for the pain, and Fallon discussed the long-term

14

effects of taking high doses of any medication. Id. Fallon discussed Hill's list of complaints with the physician in preparation for the next chronic care visit. Id.

On November 27, 2007, Fallon evaluated Hill at sick call for a reported shingles outbreak. Id. ¶ 25. Fallon prescribed an antiviral medication for genital herpes. Id.

On November 28, 2007, Fallon again saw Hill at sick call. Id. ¶ 26. Hill complained about an incorrect Prednisone prescription, requested Losartan and Acyclovir (antiviral herpes medication), and reported a lump under his left arm. Id. Hill stated that the herpes pain had begun the previous day. Id. Fallon examined Hill and called the pharmacy to reorder prescriptions for Prednisone, Losartan, and Acyclovir. Id.

On December 20, 2007, Walasin reordered Acyclovir. Id. ¶ 27.

From November 27, 2007, through December 8, 2007, and from December 20, 2007, through February 10, 2008, Hill received Acyclovir. Id. ¶ 28. From May 7, 2008, through May 8, 2008, May 27, 2008 through June 10, 2008, and June 20, 2008, through September 15, 2009, the date of Fallon's declaration, Hill received Valacyclovir, also an antiviral medication for herpes. Id.

According to Fallon, Hill also received various prescribed pain medications. Id. ¶ 29. On February 16, 2008, Hill obtained his first prescription to treat his herpes-related pain. See id. From February 16, 2008, through April 7, 2009, Hill was prescribed Oxycodone with Acetaminophen for pain. Id. Hill remained on a "regular pain control regime consisting of various medications including narcotics for pain control." Id. These medications included a Fentanyl patch, Gabapentin, Methadone, and Morphine sulfate. Id.

Defendants assert the defense of qualified immunity. See Mem. Supp. 13. Government officials are entitled to qualified immunity from civil damages so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have

15

known." Harlow v. Fitzgerald , 457 U.S. 800, 818 (1982); Rish v. Johnson, 131 F.3d 1092, 1095 (4th Cir. 1997). Qualified immunity protects government officials "where the law is unsettled or murky." Rogers v. Pendleton, 249 F.3d 279, 286 (4th Cir. 2001). Immunity applies to "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986). The test is whether the act was clearly forbidden, not whether in hindsight the action was wrongful. Rogers, 249 F.3d at 286. The Fourth Circuit has recognized a two-pronged qualified immunity inquiry:

> First, we must decide whether a constitutional right would have been violated on the facts alleged. Next, assuming that the violation of the right is established, courts must consider whether the right was clearly established at the time such that it would be clear to an objectively reasonable officer that his conduct violated that right.

Bailey v. Kennedy, 349 F.3d 731, 739 (4th Cir. 2003) (citation and quotations omitted). With respect to the second step, "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier, 533 U.S. at 202. A court has discretion to decide which step of the two-prong test to analyze first. Pearson, 129 S. Ct. at 818.

The court first considers whether defendants violated a federal statutory or constitutional right. The Eighth Amendment's prohibition against cruel and unusual punishment requires prison officials to provide medical care to inmates. See Estelle v. Gamble, 429 U.S. 97, 103 (1976). However, prisoners do not have "unqualified access to health care." Hudson v. McMillian, 503 U.S. 1, 9 (1992). In order to establish an Eighth Amendment claim for denial of medical care, a prisoner must establish "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." Estelle, 429 U.S. at 106. A serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily

16

recognize the necessity for a doctor's attention." Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008) (quotation omitted).

Deliberate indifference requires that defendants knew of and purposefully ignored "an excessive risk to inmate health or safety." Farmer v. Brennan, 511 U.S. 825, 837 (1994). "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. Thus, a prisoner must show that the staff's response to a medical condition was "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." Miltier v. Beorn, 896 F.2d 848, 851 (4th Cir. 1990). It is "obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause." Whitley v. Albers, 475 U.S. 312, 319 (1986). Deliberate indifference "sets a particularly high bar to recovery." Iko, 535 F.3d at 241; see Grayson v. Peed, 195 F.3d 692, 695 (4th Cir. 1999) ("Deliberate indifference is a very high standard—a showing of mere negligence will not meet it.").

Hill alleges that defendants violated his constitutional rights when they failed to provide pain medication and antiviral treatment for his herpes. In considering defendants' motion for summary judgment, the court focuses on deliberate indifference.

As for defendant Wilson, no reasonable jury could find that Hill acted with deliberate indifference. Wilson, a "Paramedic/Emergency Medical Technician" at Butner, conducted sick call on September 28, 2007. Am. Compl. ¶¶ 4, 16. Hill's pain began the previous night. Decl. Opp'n ¶ 20. Hill claims that he described his pain level to Wilson and explained that the pain did not abate with any change in position. See Am. Compl. ¶ 16. Although Hill was aware by late August 2007 that he had tested positive for herpes, see Decl. Opp'n ¶¶ 13–14, Hill does not indicate that he shared this information with Wilson. Hill also does not allege that he was experiencing an outbreak of

17

blisters, sores, or a rash on September 28, 2007. Wilson advised Hill that Fallon was not present, but indicated that he would request an appointment for Hill if she arrived. Otherwise, Wilson advised Hill that he would be seen at sick call on a later date. Hill does not allege that he had any other contact with Wilson either before or after September 28, 2007. Hill fails to show that Wilson knew of his serious medical needs and intentionally disregarded them on September 28, 2007.

As for defendant Fallon, no reasonable jury could find that Fallon acted with deliberate indifference. Fallon saw Hill at sick call on July 10, 2007, September 19, 2007, October 5, 2007, November 16, 2007, November 27, 2007, and November 28, 2007. Fallon Decl. ¶¶ 10, 16, 18–19, 24–26. Fallon's first visit with Hill related solely to urology symptoms and constipation. Id. ¶ 10. At the second visit, Hill's complaints were indicative of indigestion, heartburn, and a gastrointestinal virus. Id. ¶ 16. Hill did not report any blisters, sores, rash or other herpes symptoms to Fallon on those occasions. Although Hill states that he informed Fallon that he was experiencing pain in the coccyx area in early July 2007, he indicates that she planned to refer him to a urologist for further evaluation. Decl. Opp'n ¶ 10. The record shows that a urologist saw Hill ten days later, and Hill states that the urologist ordered testing for herpes. Id. ¶¶ 11–12.

On October 5, 2007, and November 16, 2007, Fallon responded to Hill's complaints of pain and blisters by examining the area. Fallon Decl. ¶¶ 18–19, 23–24. At the October visit, Fallon concluded that the rash was "beyond the point of any effective treatment with antiviral therapy." Id. ¶¶ 18–19. At the next visit, Fallon noted minimal redness and did not detect any blisters. Id. ¶¶ 23–24. Fallon remarked that the "area was clean and appeared to be healing." Id. ¶ 24. During both visits, Fallon discussed hygiene and medication issues. Id. ¶¶ 18–19, 23–24. Fallon also talked with Hill's physician about his complaints in preparation for the next chronic care visit. Id. ¶ 24. On November 27, 2007 and November 28, 2007, Fallon prescribed antiviral medication for

a herpes outbreak. Id. ¶¶ 25–26.

Similarly, no reasonable jury could find defendant Walasin acted with deliberate indifference. Walasin saw Hill on August 13, 2007, September 26, 2007, November 6, 2007, and December 20, 2007. See Fallon Decl. ¶¶ 12, 17, 20, 27. Hill also alleges that he notified Walasin that he was experiencing pain, when they passed in the hallway during a sick-call visit on September 28, 2007. See Decl. Opp'n ¶ 25. Hill voiced no herpes-related complaints to Walasin on August 13, 2007 or September 26, 2007. See Fallon Decl. ¶¶ 12, 17.

Hill's chance encounter with Walasin on September 27, 2007, does not give rise to a constitutional claim. Although Hill claims that he notified Walasin that he was experiencing pain, the record shows that the physician had examined plaintiff the preceding day. Id. ¶ 17. At that time, Hill complained about rheumatoid arthritis and did not express concern about any sores, blisters, rash, or other symptoms of herpes. See id. Moreover, Walasin noted his objection to prescribing pain medication to Hill during his scheduled visit on September 26, 2007.

On November 6, 2007, Hill presented to Walasin with pain in the right shoulder, left foot, back, and right leg. Id. ¶ 20. Hill indicated that he experienced several shingles outbreaks a year. Id. The record contains no indication that Hill was experiencing an outbreak at that time. Although Hill requested pain medication, Walasin refused. Id. ¶ 21. Walasin advised Hill that he had observed Hill walk around the compound without difficulty. Id. Walasin also indicated that he wanted to "research drug profiles to see if anti-viral therapy was compatible" with Hill's current prescriptions. Id. As reflected in the warden's response to Hill's Inmate Request to Staff, Walasin sent an e-mail on November 7, 2007, to the chief pharmacist regarding his drug compatibility concerns. See Decl. Opp'n, Ex. 8. On December 20, 2007, when Walasin next saw Hill, Walasin prescribed Acyclovir, an antiviral medication. Fallon Decl. ¶ 27.

19

Although Walasin did not prescribe pain medication to Hill on September 26, 2007 or November 6, 2007 or institute an antiviral-medication treatment plan on November 6, 2007, Hill fails to show that Walasin was deliberately indifferent to his serious medical needs through "either actual intent or reckless disregard." Miltier, 896 F.2d at 851. At most, Hill alleges that his treatment for herpes was negligent after the August 9, 2007 laboratory results, but negligence is not enough. See, e.g., Estelle, 429 U.S. at 105–06. As for Hill's disagreement with Walasin (and the other defendants) over the course of treatment, a prisoner is not entitled to choose his course of treatment. See, e.g., Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985); Russell v. Sheffer, 528 F.2d 318, 319 (4th Cir. 1975) (per curiam). Moreover, the Constitution does not afford an inmate unqualified access to medical care. "[T]he essential test is one of medical necessity and not simply that which may be considered merely desirable." Bowring v. Godwin, 551 F.2d 44, 48 (4th Cir. 1977). Walasin did not demonstrate deliberate indifference to Hill's serious medical needs.

In sum, Hill fails to show that there is a genuine issue of material fact concerning defendants' alleged deliberate indifference to his serious medical needs. Thus, the court grants summary judgment to defendants Walasin, Fallon, and Wilson on plaintiff's Bivens claim. See, e.g., Davis v. Stine, No. 6:06-156-DCR, 2006 WL 3140169, at *5–8 (E.D. Ky. Oct. 31, 2006) (unpublished).

Under the FTCA, the United States waives sovereign immunity for "the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment." See 28 U.S.C. §§ 2647, 2675(a). A prisoner "can sue under the [FTCA] to recover damages from the United States Government for personal injuries sustained during confinement in a federal prison, by reason of the negligence of a government employee." United States v. Muniz, 374 U.S. 150, 150 (1963). Because the statute "requires the law of the place where the act or omission occurred to be applied," North Carolina substantive law controls Hill's

20

negligence claim. See, e.g., Cibula v. United States, 551 F.3d 316, 319 (4th Cir. 2009) (quotation omitted); see also 28 U.S.C. § 1346(b). In North Carolina, a plaintiff asserting negligence must prove the existence of a legal duty or standard of care owed to the plaintiff by the defendant, breach of that duty, a causal relationship between the breach of duty and the plaintiff's alleged injuries, and certain actual injury or loss sustained by the plaintiff. Camalier v. Jeffries, 340 N.C. 699, 706, 460 S.E.2d 133, 136 (1995); Blackwell v. Hatley, 688 S.E.2d 742, 746 (N.C. Ct. App. 2010).

Defendant seeks to dismiss the FTCA claim because Hill failed to comply with Rule 9(j) of the North Carolina Rules of Civil Procedure. Rule 9(j) states in relevant part:

> Any complaint alleging medical malpractice by a health care provider as defined in [N.C. Gen. Stat. §] 90-21.11 in failing to comply with the applicable standard of care under [N.C. Gen. Stat. §] 90-21.12 shall be dismissed unless:
>
> > (1) The pleading specifically asserts that the medical care has been reviewed by a person who is reasonably expected to qualify as an expert witness under Rule 702 of the Rules of Evidence and who is willing to testify that the medical care did not comply with the applicable standard of care;
> >
> > (2) The pleading specifically asserts that the medical care has been reviewed by a person that the complainant will seek to have qualified as an expert witness by motion under Rule 702(e) of the Rules of Evidence and who is willing to testify that the medical care did not comply with the applicable standard of care, and the motion is filed with the complaint; or
> >
> > (3) The pleading alleges facts establishing negligence under the existing common-law doctrine of res ipsa loquitur.

N.C. R. Civ. P. 9(j).

The North Carolina General Assembly enacted Rule 9(j) in 1995 "in part, to protect defendants from having to defend frivolous medical malpractice actions by ensuring that before a complaint for medical malpractice is filed, a competent medical professional has reviewed the conduct of the defendants and concluded that the conduct did not meet the applicable standard of

21

care." Estate of Waters v. Jarman, 144 N.C. App. 98, 100, 547 S.E.2d 142, 144 (2001) (quotation omitted); see Thigpen v. Ngo, 355 N.C. 198, 203–04, 558 S.E.2d 162, 166 (2002). Failure to comply with Rule 9(j) is ground for dismissal of a state medical-malpractice claim filed in federal court. See, e.g., Estate of Williams-Moore v. Alliance One Receivables Mgmt., Inc., 335 F. Supp. 2d 636, 649 (M.D.N.C. 2004); Frazier v. Angel Med. Ctr., 308 F. Supp. 2d 671, 676–77 (W.D.N.C. 2004); Moore v. Pitt County Mem'l Hosp., 139 F. Supp. 2d 712, 713–14 (E.D.N.C. 2001).

Hill concedes that he did not comply with Rule 9(j). Mem. Opp'n 14. However, because he exhausted administrative remedies before filing suit under the FTCA, Hill asks the court to excuse his non-compliance. Id. Hill asserts that the exhaustion process provided notice to defendants of his negligence claim, which is the "equivalent" of compliance with Rule 9(j). Id. Hill also contends that he was unaware of Rule 9(j) or "any other North Carolina tort law." Id. According to Hill, Butner's law library lacks any state legal materials, including procedural rules. Id. at 15. On October 9, 2007, Hill filed an Inmate Request to Staff. Decl. Opp'n, Ex. 12. In his request, Hill asked for the "North Carolina code, law, [] or, state statute" on "bringing tort[s] for medical malpractice to court." Id.[4] Hill indicated that he submitted the request in order "to meet the pre-requisites necessary and in accordance with proper procedure to properly take [his] claims into Court." Id. As a result of his effort to obtain state law administratively before filing suit, Hill insists that he demonstrates good cause for his failure to include a Rule 9(j) certification with his complaint. Mem. Opp'n 14.

The United States, through FCI-Butner, is a "health care provider" as defined in section 90-21.11. See N.C. Gen. Stat. § 90-21.11. Hill seeks to hold the United States liable for the alleged

---

[4]The October 10, 2007, response to the request provided: "We are not required to provide any state legal material to inmates. You can find a list of all materials the law library must provide in Policy Statement 1315.07 Attachment A." Decl. Opp'n, Ex. 12.

22

negligence of its employees or staff in rendering or failing to render appropriate medical services requiring special skills. See id.; N.C. Gen. Stat. § 90-21.12; cf. Am. Compl. ¶¶ 43–50. In his amended complaint, Hill sets forth the treatment he argues that he should have received and the purported injuries that the individual defendants' alleged patient-care decisions caused him. See, e.g., Am. Compl. ¶¶ 30–31, 40. As such, Hill's negligence claim "sounds in malpractice, not ordinary negligence." Frazier, 308 F. Supp. 2d at 678; see, e.g., Duke Univ. v. St. Paul Fire & Marine Ins. Co., 96 N.C. App. 635, 640–41, 386 S.E.2d 762, 766 (1990). Thus, under North Carolina law, Hill must comply with Rule 9(j).

Rule 9(j) provides one narrow exception: a litigant is excused from Rule 9(j)'s pre-filing certification requirement if negligence may be established under the doctrine of res ipsa loquitur. See N.C. R. Civ. P. 9(j)(3). This doctrine applies "only when the occurrence clearly speaks for itself." Diehl v. Koffer, 140 N.C. App. 375, 378, 536 S.E.2d 359, 362 (2000) (emphasis removed) (quotation omitted); see, e.g., Tice v. Hall, 310 N.C. 589, 593, 313 S.E.2d 565, 567 (1984) (surgical sponge left in patient's body); Schaffner v. Cumberland County Hosp. Sys., Inc., 77 N.C. App. 689, 691–94, 336 S.E.2d 116, 118–19 (1985) (patient's hand burned during ear surgery); Hyder v. Weilbaecher, 54 N.C. App. 287, 292, 283 S.E.2d 426, 429 (1981) (stainless steel wire left in patient). Hill does not allege facts that establish negligence under the doctrine of res ipsa loquitur. Accordingly, res ipsa loquitur does not apply.

The North Carolina legislature did not create an exception for ignorance or good cause in enacting Rule 9(j). Additionally, the legislature declined to provide discretion to the court if a litigant offers an excuse for his noncompliance. See N.C. R. Civ. P. 9(j). "Rule 9(j) unambiguously requires a trial court to dismiss a complaint if the complaint's allegations do not facially comply with the rule's heightened pleading requirements." Barringer v. Forsyth County Wake Forest Univ.

23

Baptist Med. Ctr., 677 S.E.2d 465, 477 (N.C. Ct. App. 2009). Moreover, plaintiff's status as a prisoner does not excuse his failure to comply with Rule 9(j)'s pre-filing certification requirements. See, e.g., Smith v. United States, No. 1:08cv838 (LO/JFA), 2010 WL 256595, at *3 n.5 (E.D. Va. Jan. 19, 2010) (unpublished). Accordingly, because Hill failed to comply with Rule 9(j) or plead facts to fall within the res ipsa loquitur exception, the court grants the government's motion for summary judgment on plaintiff's FTCA claim for medical malpractice. See, e.g., Brown v. N.C. Dep't of Corr., No. 5:06-CT-3050-BO, 2008 WL 3910722, at *6 (E.D.N.C. Aug. 20, 2008) (unpublished); Hairston v. Gonzales, No. 5:07-CT-3078-D, 2008 WL 2761315, at *5 (E.D.N.C. July 11, 2008) (unpublished).

III.

As explained above, the court DENIES plaintiff's request for relief under Rule 56(f) of the Federal Rules of Civil Procedure [D.E. 25] and GRANTS defendants' motion for summary judgment on plaintiff's Bivens claim (count one) and FTCA claim (count two) [D.E. 19]. The Clerk of Court is DIRECTED to close the case.

SO ORDERED. This _5_ day of August 2010.

JAMES C. DEVER III
United States District Judge

24